805 F.2d 396
 256 U.S.App.D.C. 296
 Leonard N. BEBCHICK, et al., Petitioners,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
D.C. Transit System, Inc., Intervenor.
D.C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,
Leonard N. Bebchick, et al., Intervenors.
D.C. TRANSIT SYSTEM, INC., Petitioner,
v.
WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent.
 Nos. 23720, 23747 and 74-2056.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 15, 1984.
Decided Nov. 7, 1986.
 
 On Supplementary Review Proceedings.
 Leonard N. Bebchick, Washington, D.C., for petitioners, Leonard N. Bebchick, et al. in No. 23720.
 Donald J. Balsley, Jr., Washington, D.C., for respondent, Washington Metropolitan Area Transit Commission, in No. 23720, and intervenor in No. 23720.
 Harvey M. Spear, New York City, for D.C. Transit System, Inc., intervenor in No. 23720.
 Gilbert Hahn, Jr. and Mary Kathleen Hite, Washington, D.C., were on the brief of intervenors, Black United Front, et al. in support of brief of petitioners Leonard N. Bebchick, et al.
 Before ROBINSON, Circuit Judge, MacKINNON, Senior Circuit Judge, and DAVIS,* Circuit Judge, United States Court of Appeals for the Federal Circuit.
 Opinion for the Court filed by Circuit Judge DAVIS.
 DAVIS, Circuit Judge:
 
 
 1
 This old case is before us, once more,[1] this time for disposition of issues arising from the respondent Washington Metropolitan Area Transit Commission's (Commission or WMATC) Report of Findings and Recommendations Bebchick III, Phase One,[2] on remand from this court's decision in Bebchick v. Washington Metropolitan Area Transit Comm'n, 645 F.2d 1086 (D.C.Cir.1981) (Bebchick III ). We have also to determine an attorneys' fee award for counsel for the Bebchick group (Bebchick).[3]
 
 I.
 
 2
 The facts surrounding this litigation have been discussed in detail in prior decisions of this court,[4] and will not be restated here, except as relevant to this opinion. This latest round of litigation involving D.C. Transit System, Inc. (Transit) stems from this court's remand in Bebchick III to the Commission of four tasks:
 
 
 3
 (1) Recalculation of the tax expense to be deducted from the value increase on six properties put below the line;
 
 
 4
 (2) Computation of the precise amount of restitution due, including interest;
 
 
 5
 (3) Determination of attorneys' fees for counsel for the Bebchick group; and
 
 
 6
 (4) Recommendations for the suitable disposition of the balance of the restitutionary fund.
 
 
 7
 On remand from Bebchick III, the Commission divided its assignment into two parts. In its Phase One Report, the Commission addressed the issues related to the calculation of the total restitution due farepayers.[5] Although the Commission at one point believed that a "Phase Two Report"--calculating attorneys' fees and determining the distribution of the balance of the restitution fund--would be forthcoming, the Commission in its Phase One Report, troubled by what it considered a defective fee application by the Bebchick group, requested (by motion) this court to clarify and elaborate on its Bebchick III instructions[6] pertaining to attorneys' fees. Consequently, the Phase Two Report has not been issued.
 
 II.
 
 8
 The first task before the Commission on remand was the recalculation of the tax expense to be deducted from the value increase on the six Bebchick III properties put below the line (taken out of operation).[7] Using the "general methodology" employed in the "Banks Study,"[8] the Commission determined that the net gain after taxes of the properties (land and buildings) should be $2,937,892.[9] This determination which is in accord with our directive in Bebchick III has not been challenged by any of the parties, and is adopted by this court.
 
 
 9
 Next, the Commission, on remand, was ordered by the court to compute the precise amount, including interest, of the total restitution due from Transit in the Bebchick litigation. In so doing, the court specifically ordered that "[n]o offsets should be made from this amount [total restitution]...." Bebchick III, 645 F.2d at 1096. Moreover, the court specified the precise starting date for the interest accrual as well as the applicable rate of interest to be applied.[10]
 
 
 10
 Because the net gain on the sale of the six properties did not fall below $1,058,856, the amount of the depreciation deficiency, the Commission correctly determined that $806,168, the total amount taken out of the riders' fund by Transit to apply to the deficiency, should be included as part of the restitution principal. The Commission also properly included as part of the total restitution principal $765 of non-attorney expenses incurred by Bebchick on the remand from Bebchick II.[11] Thus, the pre-interest restitutionary fund consisted of the following:
 
 
 11
 Subsequently, the Commission calculated the amount of compensatory interest due on the depreciation deficiency principal component as well as that portion of the principal consisting of the $1,461,756 of excess earnings already deposited in the court-ordered account. No dispute exists as to computational methodology or calculations used by the Commission to compute the interest accrual on the restitution. The Bebchick group has updated, as of December 20, 1984, the Commission's calculation of the interest.[12] In accordance with the calculations submitted by the Bebchick group, the precise amount of the total restitution due, as of December 20, 1984, was $5,827,254 including principal and interest;[13] $3,798,198 of this total was on deposit at American Security Bank with the difference of $2,029,056 owing from Transit. The Commission has agreed with this computation. However, Transit argues that this amount is excessive on two grounds.
 
 
 12
 First, Transit argues that the court in Bebchick III did not award compensatory interest on the excess earnings component of the restitution award. We must reject this argument. This court said in Bebchick that
 
 
 13
 [t]here is no doubt that interest is allowable on funds which are required to be repaid as restitution. In this instance, Bebchick et al. never waived their demand for interest on the funds ultimately required to be restored to the riders' fund, but insisted on it at the proper times.
 
 
 14
 645 F.2d at 1093 (citations omitted). We understand this statement, together with other portions of Bebchick III, as unequivocally granting petitioner's request for compensatory interest on any and all funds required to be paid by Transit to the riders' fund and not merely on the depreciation component of the restitution. Further, in view of the position taken by this court in Bebchick III, we do not now think, as Transit contends, that the equities in this case preclude an award of interest on the excess earning component of the restitution or that the Bebchick group has waived its claim for interest on that amount.
 
 
 15
 Another argument presented by Transit to support its contention that the $2,029,056 restitution balance (as of December 20, 1984) is excessive, is that it is entitled to offsets for the amounts of the bus maintenance award[14] and the cost-of-living award.[15] This court recognized in its Bebchick III opinion that Transit is entitled to recover bus maintenance and cost-of-living expenses only after it has been "authoritatively determined (a) what is the full restitution owing on account of the claims of the Bebchick group, and (b) the resources available to pay that amount." 645 F.2d at 1095. Moreover, the court cautioned that
 
 
 16
 the various equities and offsets asserted by Transit have no application to the limited claims we are now considering, those of the Bebchick group. Those restricted claims, centering in the riders' fund established in 1963, are set apart from the other claims as to which the equities or offsets may be relevant. Bebchick II was very specific in its holdings and did not contemplate that any of these equities should be considered in connection with this distinct restitutionary sum.
 
 
 17
 Id. Finally, as we have said earlier, this court admonished the Commission on remand that "[n]o offsets should be made from this amount [total restitution to the Bebchick group]...." Id. at 1096.
 
 
 18
 In the present circumstances, we believe that any offset by Transit of cost-of-living expenses from the total restitution award is wholly foreclosed by this court's opinion in Bebchick III. Respecting the bus maintenance expenses, the Bebchick group has conceded Transit's entitlement to such an offset in the amount of $701,514 (as of December 20, 1984), composed of $273,060 in principal and $428,454 of accrued interest.[16] Accordingly, this offset is properly to be taken. Nevertheless, we make it clear that Transit's offset claims are last in time and priority. The riders are first entitled to full restitution (principal plus interest) of the unlawful fares paid by them under Order No. 245 during the period April 14, 1963--January 26, 1966. The riders are next entitled to full reimbursement for $806,168 (plus interest) ordered withdrawn from the riders' fund on January 26, 1966 to cover the non-existent depreciation deficiency. Under this scheme of priority, Transit is required first to pay into the court-ordered account the difference between the amount of restitution due and the amount of the bus maintenance allowance. This permits Transit to recoup its shortfall from the riders' fund without depriving the petitioners of any monies due them.
 
 III.
 A.
 
 19
 As we have already said, we also directed the Commission to determine an appropriate award of attorneys' fees for counsel for the Bebchick group. In turn, the Commission requested the Bebchick group to submit a fee application. A comprehensive and thorough fee application was submitted on December 3, 1982. It requested fees pertinent to the involvement of the Bebchick group in twelve prior proceedings involving Transit. The Commission, however, was of the view that the court in Bebchick III awarded fees for activity only in the limited context of the Bebchick III litigation itself (i.e., excluding fees for the other efforts expended during the approximately twenty-two years of litigation related to Transit). The Commission then asked this court for clarification and additional instructions. On November 23, 1984, we ordered that Bebchick be awarded $500,000 as partial payment for attorneys' fees and expenses incurred during the course of this litigation. The remainder of this fee matter was held for further disposition by the court.
 
 
 20
 The Bebchick group urges the court not to remand the attorneys' fee matter back to the Commission, but to decide the issue itself. They argue that (1) the delay associated with another remand proceeding should be avoided if possible; (2) the facts concerning the fee application are not disputed; (3) a detailed and thorough fee application (filed with the Commission) is now before the court; and (4) the determination of fees by this court at this time is proper because the calculation of fees is uniquely a judicial function. The Commission in the main does not oppose the request for fees and expenses.[17]
 
 
 21
 Transit contests the fee application. In Transit's view, the remand in Bebchick III for disposition of the attorneys' fee question covered only proceedings directly related to Bebchick III. We wholly disagree with that position. In addition, Transit submits that under the "law of the case," the Commission and not the court should determine the award of fees and expenses.
 
 
 22
 "A request for attorney's fees should not result in a second major litigation." Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Transit's contention that the Commission is still the proper body to determine fees is at odds with the Supreme Court pronouncement in Hensley and common sense. There is now no need for further Commission action. All of the facts that are relevant to the determination of fees are now before the court, and all that remains to be done is the computation of a fee award to compensate counsel for litigation that spanned over two decades before this court. We undertake that task.B.
 
 
 23
 The Bebchick group does not request fees under a provision of a statute. Rather, under one exception to the American Rule[18]--the "common fund" doctrine--they urge that the court under "the historic power of equity [can] permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. [footnote omitted] That rule has been consistently followed. Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885); Harrison v. Perea, 168 U.S. 311, 325-26, 18 S.Ct. 129, 134-35, 42 L.Ed. 478 (1897); United States v. Equitable Trust Co., 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379 (1931); Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Hall v. Cole [412 U.S. 1, 4, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973) ]; cf. Hobbs v. McLean, 117 U.S. 567, 581-82, 6 S.Ct. 870, 876-77, 29 L.Ed. 940 (1886). See generally Dawson, Lawyers and Involuntary Clients: Attorney Fees From Funds, 87 Harv.L.Rev. 1597 (1974)." Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 257-58, 95 S.Ct. 1612, 1621-22, 44 L.Ed.2d 141 (1975).[19] The "common fund" doctrine is designed to spread the costs of litigation among all the beneficiaries of an identifiable fund over which a court can exercise legitimate control, in effect guarding against the unjust enrichment of passive beneficiaries at the expense of the active beneficiary. Vincent v. Hughes Air West, Inc., 557 F.2d 759, 769-70 (9th Cir.1977).
 
 
 24
 In establishing reasonable attorneys' fees, we shall--as did the Bebchick group in its fee application--employ as a general guide the methodology of Copeland v. Marshall, 641 F.2d 880 (D.C.Cir.1980) (in banc). Although the Copeland approach was designed to prescribe a standard for the award of Title VII discrimination suits, it was based in part on the Third Circuit's opinion in Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., 487 F.2d 161 (1973) (Lindy I ), and its successor case, Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corp., 540 F.2d 102 (1976) (Lindy II ), involving an award of counsel fees in an antitrust action under the "equitable [common] fund doctrine." Copeland has since been followed with appropriate modifications in other types of civil actions.[20]
 
 
 25
 In Copeland, the court recognized that the starting point for determining a reasonable fee is the " 'lodestar': the number of hours reasonably expended multiplied by a reasonable hourly rate." 641 F.2d at 891. The number of hours reasonably expended is not the necessary equivalent of the number of hours actually worked on the case; compensation is not permitted for non-productive time. Further, the reasonable hourly rate is that prevailing in the community for similar work. It "is the product of a multiplicity of factors.... [T]he level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case." Id. at 892.
 
 
 26
 The next step in the process involves adjustments to the lodestar. Of course, the party proposing any adjustment to the lodestar bears the burden of justification. Blum v. Stenson, 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Some factors that may be relevant to changes from the lodestar include the contingent nature of success, harm resulting from delay in payment, benefit to the public, and possibly the quality of representation. With regard to the contingent nature of success, it may be appropriate in some circumstances to compensate counsel for the risk as seen at the start of the litigation that the suit would be unsuccessful and that no fees would be forthcoming. Sierra Club v. Environmental Protection Agency, 769 F.2d 796, 809 (D.C.Cir.1985); Laffey v. Northwest Airlines, 746 F.2d 4, 26-29 (D.C.Cir.1984), cert. denied, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985); Murray v. Weinberger, 741 F.2d 1423, 1431 (D.C.Cir.1984). Also important for the purposes of the Bebchick group's recovery is "[t]he delay in receipt of payment for services rendered [which] is an additional factor that may be incorporated into a contingency adjustment." Copeland, 641 F.2d at 893. As this case amply demonstrates, "[c]ourt-awarded fees normally are received long after the legal services are rendered." Id.[21] An additional factor that, as we have said, may possibly be considered in adjusting the lodestar is the quality of representation. "A quality adjustment [up or down] is appropriate only when the representation is unusually good or bad, taking into account the level of skill normally expected of an attorney commanding the hourly rate used to compute the 'lodestar'." Id. (Emphasis omitted.) Thus, any upward adjustment from the lodestar based on the quality of representation is justified only where the attorneys' efforts lead to exceptional results. Blum, 465 U.S. at 899, 104 S.Ct. at 898.[22]
 
 C.
 
 27
 The Bebchick group has submitted a thorough fee application detailing over 6,000 hours devoted to this representation which at this point has spanned over twenty years and has required active involvement in twelve separate regulatory and judicial proceedings. Counsel advances a claim for a fee of $1,675,000 (approximately 25% of the restitution recovery as of December 1984).[23] Also requested is $34,200 as compensation for three experts employed by Bebchick.
 
 
 28
 The first element of the lodestar inquiry is a determination of the number of hours reasonably expended by counsel during representation. Counsel for these protestants expended approximately 6,000 hours over a twenty year period in which they overturned two Commission rate orders and later reversed three sets of Commission remand determinations. Counsel also prosecuted five judicial challenges to Commission action, and pursued actions both in the District Court and Court of Appeals to secure for the protestants' restitution of at least $2,250,000 (as of December 1984).[24] To aid this court in determining whether the hours claimed above were reasonably expended, counsel have submitted, in the fee application, a listing of hours for each significant activity undertaken in each major proceeding. This hourly listing is in accord with our directive in Copeland that counsel submit "fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys...." Copeland, 641 F.2d at 891 (quoting Lindy I, 487 F.2d at 167).
 
 
 29
 After reviewing the documentation submitted by counsel,[25] we conclude that the 6,053 hours (including 200 hours for associates' billings) claimed by counsel constituted a reasonable expenditure of time for the twelve separate proceedings spanning the approximately twenty-year period.[26]
 
 
 30
 We turn next to the second element in determining the lodestar figure--the reasonable hourly rate. As Copeland directs, "[t]he reasonable hourly rate is that prevailing in the community for similar work." 641 F.2d at 892. Of course, "the actual rate that applicant's counsel can command on the market is itself highly relevant proof of the prevailing community rate." National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1326 (D.C.Cir.1982). Bebchick has submitted information relevant to counsel's actual billing practices and the actual billing practices of comparably experienced attorneys engaging in complex regulatory or ratemaking proceedings and litigation.
 
 
 31
 The great bulk of the work was performed by Leonard N. Bebchick himself. Because the attorney's reputation and experience are relevant considerations for the determination of counsel's fees, we briefly summarize Mr. Bebchick's qualifications. Upon graduation from Yale Law School in 1958, he worked as a staff attorney in the Commercial Rates Section of the Civil Aeronautics Board. In 1960, he entered private practice specializing in regulatory matters as an associate with a law firm in Washington, D.C. Since 1964, Mr. Bebchick has conducted his own practice, concentrating on matters involving the economic regulation of airlines. He has extensive experience in both licensing and ratemaking proceedings. In 1966, he was appointed Special Counsel to the D.C. Public Service Commission with the responsibility for assisting the Commission in a PEPCO (Potomac Electric Power Company) rate investigation. One year later, he was appointed Special Counsel and Consultant to the Virgin Islands Public Utilities Commission, and over a four-year period conducted a broad inquiry into various practices of the Virgin Islands Telephone Company. In addition, Mr. Bebchick has also served as Chairman of the Advisory Committee on Aeronautical Law to the President of the American Bar Association.
 
 
 32
 During 1982, Mr. Bebchick's services were billed between $150 and $185 per hour. Counsel have conducted a survey of law firms in Washington, D.C. that have established ratemaking and utility regulatory practices. The rates charged by these firms for work performed by partners was between $140 and $210 per hour. In light of the documentation submitted by the Bebchick group detailing both Mr. Bebchick's current billing practices and those of other firms, we find that the appropriate hourly rates for purposes of calculating the lodestar are $160 per hour for Mr. Bebchick's representation and $85 per hour for that of his associates.[27]
 
 
 33
 Based on the above figures, the lodestar is calculated as follows:
 
 
 34
 Hours Rate/Hour Total
Partners 5,853 160 $936,480
Associates 200 85 17,000
 --------
 $953,480
 
 D.
 
 35
 The Bebchick group seeks a lodestar adjustment up to $1,675,000 which is slightly under 1.6 enhancement, i.e., approximately 25% of the riders' fund.[28] For the reasons that follow we hold that counsel have met the heavy burden of exceptionality placed on a fee applicant to justify such an award adjustment[29] and that the requested 1.6 lodestar adjustment is reasonable and should be accepted.
 
 
 36
 Because our upward adjustment of the lodestar figure turns upon the "common fund" nature of this case, the many levels of contingency that counsel succeeded in overcoming, the public interest nature of the suit, and the unusually good representation provided by counsel, we repeat a brief summary which was set forth in Bebchick III:
 
 
 37
 * * * When Transit, as the new franchise of the mass transportation system within the Washington metropolitan area, acquired in 1956 the assets of Capital Transit Company, those assets had a net book value of some $23,880,000, according to Transit figures. Transit says it paid $13,540,000 for the assets (and assumed Capital's obligations). As envisaged, when Transit acquired the assets, the company then converted (as of August 15, 1963) to an all-bus operation, and certain properties no longer needed were removed from operating status (i.e., put "below the line"). Shortly thereafter, the Commission determined a deficiency in the depreciation reserve needed to cover those properties (put "below the line") while they were operating. Meanwhile in 1963, in Bebchick I, supra, 115 U.S.App.D.C. at 232-33, 318 F.2d at 203-04, this court, after reversing a particular fare increase, had established (from the invalid fares) a riders' fund, a reserve on Transit's book for the benefit of the consumers. The Washington Metropolitan Area Transit Commission (Commission), which succeeded the D.C. Public Utilities Commission as the regulatory agency, wished to use this riders' fund to help make up the depreciation deficiency. The riders' fund was also involved, at about the same time, when this court overturned later higher fares which had been allowed by the Commission but the court provided that, though the fares were improper, Transit was entitled to retain a fair return; if there were not such a fair return the riders' fund could be used to make up the difference, while if excess earnings existed they were to be added to the riders' fund. The matter of the adjustments to the riders' fund, including the existence vel non of excess earnings, was returned to the Commission. The Commission then ruled that there were no excess earnings and that a substantial deficiency still existed in the depreciation fund which should be made up from the riders' fund.
 
 
 38
 In Bebchick II, in 1973, the court again reversed the Commission, holding that there were in fact considerable excess earnings which should be added to the riders' fund ($1,461,756) and also that the Commission should undertake to decide whether Transit's investors had been compensated for the depreciation deficiency by the appreciation in value of the depreciable portion (i.e. buildings) of six particular properties found no longer necessary for non-trolley operation--transferred from above to below the line.
 
 
 39
 On remand from Bebchick II, the Commission recommended that Transit give a net credit to the riders' fund in this case. * * * *
 
 
 40
 645 F.2d at 1088.
 
 
 41
 In Bebchick III, the issue was whether Transit's investors were properly compensated by appreciation in value of six properties put below the line for any of the depreciation deficiency. The court first rejected Transit's contention that appreciation in value should be determined on a "market-to-market," rather than on a "book-to-market," basis. Next, the court agreed with protestants that the Commission erred in granting Transit an allowance for constructive rather than actual taxes in calculating the amount of economic benefit realized by Transit's investors. The court also held that protestants were entitled to interest on the amounts of restitution due from Transit. Concerning the question of expenses, the court rejected Transit's challenge to the Commission's assessment against it of the cost of the remand proceedings and rejected the Commission's determination that the riders should bear the costs both assessed against and incurred by Transit in connection with the remand proceedings. Finally, the court rejected Transit's contention that it was entitled to any offset or allowance for bus maintenance until the riders were made whole.
 
 
 42
 The first factor supporting the claimed enhancement is that this is a "common fund" case, not one in which fees can be allowed only under specific legislation. Where the fees, as here, will come out of a "common fund," "a reasonable fee is based on a percentage of the fund bestowed on the class." Blum, 465 U.S. at 900, n. 16, 104 S.Ct. at 1549, n. 16. The "common fund" doctrine is an accepted part of the common law tradition, neither requiring a statutory exception to the general American Rule against the award of fees nor governed by Congressional (or other legislative) limitations on the award of fees. It is significant that this "common fund" doctrine recognizes percentage awards and is not restricted purely to the lodestar method. That this is a "common fund" case permits award of a fee based on a percentage of the recovery, and is an important factor in deciding that the lodestar figure is not the maximum award. Here, the requested percentage (25% of the recovery) is a reasonable percentage for otherwise uncompensated attorneys.
 
 
 43
 The second enhancement factor stems from the many levels of contingency that counsel succeeded in overcoming--contingencies related to the creation and preservation of the "common fund." Several victories had to be won before the fund was first created and later in order to prevent it from being dissipated. The initial victory before the Commission limited Transit's proposed 5cents token fare increase to a 1 1/4 cents increase. But that successs did not produce a restitutionary fund from which fees could come, nor did any statute entitle counsel to an award of fees. Similarly, the appeal from that initial victory to this court, which obtained a reversal and a remand even of the Commission's decision to allow a lesser increase in fares than Transit had sought, produced no fund from which attorney fees could come. Later, in Williams (in 1968), in which the court concluded that a remand was not warranted because the Commission lacked the authority retroactively to prescribe fares, the question of restitution finally arose. The Bebchick group then had to overcome two additional hurdles: (1) persuade the court that a grant of restitution (not a matter of right) was proper, and (2) determine the appropriate size of the fund. The latter hurdle produced another remand and additional administrative and judicial proceedings. All this took years of time and effort.
 
 
 44
 Thus, to secure the "common fund," the Bebchick group had first to prevail on issues themselves not leading to restitution; had then to take the chance that restitution would be awarded and that the amount would be substantial; and finally to take the risk that the opposing party would be capable of discharging the restitution decree. Even though the Bebchick group and its counsel prevailed on the underlying merits of their rate claims, the court might have chosen another remedy which did not produce a "common fund," and there was no statute permitting an award of fees in those circumstances. In sum, the contingencies of creating and preserving the "common fund" were many and prolonged.
 
 
 45
 The other side of the coin is that, at the time the suit was first brought and for some years thereafter, it was uncertain that counsel would succeed at all and, if they did, whether they would receive compensation, and if they did receive compensation, how much. This contingent nature of counsel's compensation is a factor to be considered in an exceptional case--a class of which this litigation is an exemplar by nature of its length and delayed recovery, multitude of steps, the burden carried by counsel and the nature of the representation, as well as the public benefit accruing from counsel's efforts.[30]
 
 
 46
 Another factor argued by Bebchick as supporting an upward adjustment to the 'lodestar' figure is the unusually good representation provided by Mr. Bebchick, taking into account the hourly rate ($160 per hour) and the degree of success and amount of recovery obtained.[31] Cognizant of the Supreme Court's declaration in Blum, 465 U.S. at 899, 104 S.Ct. at 1549, that "[t]he 'quality of representation,' ... generally is reflected in the reasonable hourly rate" and that an upward adjustment of the lodestar for quality representation requires that the "quality of service rendered [be] superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional,' " we think that nevertheless an upward adjustment is called for on account of this factor.
 
 
 47
 Counsel exhibited an unusually high level of skill which is not reflected in the hourly charge utilized to compute the lodestar. At each stage of the various proceedings over the last 20 years, the Bebchick group diligently challenged all attempts to infringe upon the entitlements of their clients. Counsel showed considerable initiative and inventiveness in exploring various analytical approaches, such as methods to amortize the acquisition adjustment account, compute tax expense, and calculate a properties unrecovered cost net of the acquisition adjustment. Counsel conceived of the theory that the riders are entitled to the economic benefit arising when properties pass below the line. The issues involved before the Commission and the courts were both novel and difficult.[32]
 
 
 48
 Counsel's skill is further evidenced by their continuous success in overturning Commission determinations--the most recent being in the Bebchick III decision where the court rejected the Commission's efforts to saddle the riders with the costs of the remand proceedings and hypothetical tax expenses. Suffice it to say that counsel have an unbroken string of successes in reversing Commission rate orders and Commission remand determinations. The Bebchick group prevailed in virtually every judicial challenge taken to Commission action during that period of time and secured two separate decrees of restitution (Bebchick I and Williams ), as well as an award of prejudgment interest on the second award. Subsumed within both the contingent nature of counsel's success and the quality of counsel's representation is the heavy burden that counsel overcame in securing the riders' fund. Counsel repeatedly obtained reversals of Commission action under the arbitrary and capricious standard of review, although it is extremely difficult to persuade a court that an administrative body--exercising its quasi-legislative powers--has acted unreasonably in determining the proper level of a particular schedule of fares.
 
 
 49
 Finally, we think that an upward adjustment to the lodestar is appropriate to reflect the benefits to the public flowing from this litigation. It is not unreasonable to consider the public benefits of counsel's efforts in determining the level of reasonable compensation. See, e.g., City of Riverside v. Rivera, --- U.S. ----, 106 S.Ct. 2686, 2693-96, 91 L.Ed.2d 466 (1986) (plurality opinion); Environmental Defense Fund Inc. v. Environmental Protection Agency, 672 F.2d 42, 59 (D.C.Cir.1982) (court awarded upward adjustment of "15-20%, to reflect 'benefits to the public from suit,' and 'the delay in receipt of payment for services rendered.' ") (citation omitted).
 
 
 50
 We add, for completeness, that in Wildman v. Lerner Stores Corp., 771 F.2d 605, 613-14 (1st Cir.1985), the First Circuit listed five specific factors (in addition to the exceptionality of the representation or the success) which should be taken into account in assessing the contingency risks undertaken by counsel.[33] In general, these factors concern (i) the attorneys' potential payment for services and costs if the suit had not been successful, and (ii) counsel's dependency on the court for their fees even though the suit was in fact successful. In the current instance of payment from a "common fund," it is plain that the attorneys here would not have been paid if the litigation had been unsuccessful and they would have borne considerable costs and expenses; that they are wholly dependent on the court for any fees they receive from the "common fund"; and that Mr. Bebchick was required to compensate his associates and carry his overhead expenses--for a very long period--without assurances of compensation. The last factor--whether other attorneys refused to take the case because of a risk of non-payment--is not truly known to us, but the likelihood seems to be that those who originally initiated this litigation did so without consulting other counsel. Under the Wildman factors, therefore, no diminution in the risk contingency is called for.
 
 
 51
 The end-result is that, under the standards we have considered, counsel are entitled to their requested fee of $1,675,000 (as of December 1984) which is about one-quarter of the "common fund."[34] As we have said, that is about 60% enhancement of the lodestar figure, a total of enhancement we consider justified in view of the fact that this is a "common fund" case and of the established enhancement factors. If we are called upon to designate the percentage of enhancement attributable to each separate element,[35] we attribute 25% (of the 60% enhancement) to the fact this is a common-law "common fund" case, 15% to the contingency of success and of compensation, 10% to the high quality of representation, and 10% to the public's benefits.
 
 
 52
 Also requested is $34,200 (as of December 1984) as compensation for three experts. Protestants employed the expert accounting and economist services of three persons in the proceeding on remand from Williams. These experts were retained by the protestants on the understanding that they would be paid a fee out of the proceeds of any restitutionary award. An award of $11,800 for one and $11,200 each for the other two is requested and now granted, such amounts to be borne by the riders and paid out of the proceeds of the fund. We also grant protestants' unopposed request for $933.65 as reimbursement for expenses incurred in pursuing the fee application and also the $765.00 for expenses already awarded by the Commission. There is also a bill of costs filed in this court (in No. 23720) for $545.80. The total of these expenses is $2,244.45 likewise to be awarded counsel.
 
 CONCLUSION
 
 53
 We have determined that (a) the total amount of restitution due the riders (as a result of the activities of the Bebchick group) was $5,827,254 (as of December 20, 1984) (see supra Part II); (b) the amount of attorney fees due counsel for the Bebchick group was $1,675,000 as of December 20, 1984, of which $500,000 has already been paid (see supra Part III); (c) the sum of $34,200 was due to experts, also as of December 20, 1984 (see supra Part III); and (d) the total amount of costs and expenses due counsel for the Bebchick group is $2,244.45 (see supra Part III). All these unpaid amounts will continue to bear interest at a rate equal to the yield realized by the funds deposited in the bank (pursuant to court order) until payment. See supra note 34. Payment of fees and expenses will be made on order of the court.
 
 
 54
 As of July 24, 1986, that fund on deposit in the bank amounted to $3,691,935; as of September 18, 1986, it was $3,748,708. Two issues remain with respect to that fund and the disposition of the restitution due the riders: (1) when and to what extent shall Transit be required to make further deposits into the fund, and (2) decision as to suitable disposition of the balance of the restitutionary fund after payment of all fees and expenses. These two matters will be deferred until disposition by the court of Nos. 21865, 24398, 24428, et al. (known collectively as Democratic Central Committee I and II ).
 
 
 55
 Our jurisdiction of this case continues to be retained in full.
 
 
 56
 So Ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 See Bebchick v. Public Utilities Comm'n, 318 F.2d 187 (D.C.Cir.) (in banc), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963) (Bebchick I ); D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n, 350 F.2d 753 (D.C.Cir.1965) (in banc); Williams v. Washington Metropolitan Area Transit Comm'n, 415 F.2d 922 (D.C.Cir.1968) (in banc), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); Bebchick v. Washington Metropolitan Area Transit Comm'n, 485 F.2d 858 (D.C.Cir.1973) (Bebchick II ); Bebchick v. Washington Metropolitan Area Transit Comm'n, 645 F.2d 1086 (D.C.Cir.1981) (Bebchick III ). See also Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Comm'n, 485 F.2d 786 (D.C.Cir.1973) (D.C.C. I ), and Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Comm'n, 485 F.2d 886 (D.C.Cir.1973) (D.C.C. II ). Certiorari was denied in D.C.C. I and D.C.C. II in 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974)
 
 
 [2]
 WMATC, Report on Findings and Recommendations, Bebchick III, Phase One (Feb. 25, 1982) (cited as Phase One Report)
 
 
 [3]
 Originally, the determination of an attorneys' fee award for Bebchick was to be made on remand by the Commission. See Bebchick III, 645 F.2d at 1096. The Commission, however, seeks clarification of the scope of our remand for disposition of attorneys' fees, and, of course, has not decided the question of those fees. With the goal of judicial efficiency in mind, and the reality that this litigation has stretched for over twenty years, this court will now decide the attorneys' fee matter with respect to the Bebchick group. See infra Part III
 
 
 [4]
 See supra note 1, and infra pp. 405-406
 
 
 [5]
 See supra note 2 and infra Part II
 
 
 [6]
 See Bebchick III, 645 F.2d at 1095
 
 
 [7]
 The six properties put below the line were the Grace Street Shop, Central Garage, Northeastern Garage, M Street Shop, Navy Yard Carhouse, and the General Office Building
 
 
 [8]
 As this court stated in Bebchick III, 645 F.2d at 1093, "[F]or this case the Banks study is acceptable and the gain on the six properties should be computed on the basis of its general methodology. On remand, the Commission should make this numerical determination of the tax expense, following the Banks report." See also Phase One Report at 11-16
 
 
 [9]
 See Phase One Report at 24 App.E. The Commission was directed to make this determination in order to confirm previous calculations which were not in the record. This figure is relevant to the determination of the amount of restitution due to the petitioners in D.C.C. I and D.C.C. II
 
 
 [10]
 See Bebchick III, 645 F.2d at 1093-94, where this court stated that (1) it was fair and equitable to start the running of interest as of June 28, 1973, the day Bebchick II was decided, (2) "[t]he rate at which interest has been paid on the sums in [the court-ordered fund held at American Security Bank] is the proper rate to charge Transit for the restitution to the Bebchick group since December 19, 1974" (the date of deposit), and (3) 7.1% was a fair rate of return for the period from June 28, 1973 to December 19, 1974 (based on the rise in the Consumer Price Index and the prime rate charged by Union First National Bank of Washington and its predecessor)
 
 
 [11]
 The Commission noted that "[t]his claim was supported by copies of handwritten ledger sheets" and that "the Bebchick group has conscientiously booked its expenses...." Phase One Report at 40-41
 depreciation deficiency: $ 806,168.00
excess earnings: 1,461,756.00
non-attorney expenses: 765.00
 -------------
 $2,268,689.00
 
 
 [12]
 Motion of Petitioners for an Increase in the Amount of Restitution to be Deposited, Brief for Petitioners, App. B at 3
 
 
 [13]
 This sum included (1) the depreciation deficiency, $806,168 plus $1,264,946 interest; (2) the excess earnings, $1,461,756 plus $2,293,619 interest; and non-attorney expenses, $765.00
 
 
 [14]
 The bus maintenance award was part of the determination in Bebchick II, 485 F.2d at 868. The Commission previously reported to the court the amount of $273,060 which, with interest, properly should be recovered by Transit from the farepayers. The "offset" issue thus involves only the matter of when and from where Transit should receive this reimbursement
 
 
 [15]
 The cost-of-living award arose from a separate and unrelated proceeding. See D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission, 485 F.2d 881 (D.C.Cir.1973). Transit seeks $283,869 as an offset for cost-of-living
 
 
 [16]
 See Brief for Petitioners at 9, 16
 
 
 [17]
 At this stage of the proceedings, "[t]he Commission recommends that the Court enter a fee award for counsel to the Bebchick Group for all prior administrative and judicial proceedings." Brief for Respondent at 12
 
 
 [18]
 Under the American Rule, attorneys' fees are not awarded to the successful litigant absent statutory authority. There exist three judge-made exceptions to this rule. Attorneys' fees can be granted "for willful violation of a court order, Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426-28 [43 S.Ct. 458, 465-66, 67 L.Ed. 719] (1923); for bad faith or oppressive litigation practices, Vaughan v. Atkinson, 369 U.S. 527, 530-31 [82 S.Ct. 997, 999-1000, 8 L.Ed.2d 88] (1962); and [the common fund doctrine] where the successful litigants have created a common fund for recovery or extended a substantial benefit to a class, Central Railroad & Banking Co. v. Pettus, 113 U.S. 116 [5 S.Ct. 387, 28 L.Ed. 915] (1985)." Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 275, 95 S.Ct. 1612, 1630, 44 L.Ed.2d 141 (1975) (Marshall, J., dissenting)
 
 
 [19]
 See also Trustees v. Greenough, 15 Otto 527, 535, 105 U.S. 527, 535, 26 L.Ed. 1157 (1882), where the Court stated that "[t]he fee-bill is intended to regulate only those fees and costs which are strictly chargeable as between party and party, and not to regulate ... the power of a court of equity, in cases of administration of funds under its control, to make such allowance to the parties out of the fund as justice and equity may require."
 
 
 [20]
 See, e.g., Alabama Power Co. v. Gorsuch, 672 F.2d 1, 6 (D.C.Cir.1982) (attorneys' fee award under the Clean Air Act); Environmental Defense Fund, Inc. v. Environmental Protection Agency, 672 F.2d 42, 52 (D.C.Cir.1982) (attorneys' fee award under the Toxic Substances Control Act)
 
 
 [21]
 In Copeland, 641 F.2d at 893 n. 23, the court also noted that "if the 'lodestar' itself is based on present hourly rates, rather than the lesser rates applicable to the time period in which the services were rendered, the harm resulting from delay in payment may be largely reduced or eliminated." (Emphasis omitted.) In Library of Congress v. Shaw, --- U.S. ----, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986), the Court held that attorneys' fees awarded against a federal agency for past services could not be set at present hourly rates to compensate for delay in payment. See infra note 34
 
 
 [22]
 As the Court stated in Blum, 465 U.S. at 899, 104 S.Ct. at 1549,
 The 'quality of representation,' however, generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of services rendered was superior to that one reasonably should expect in light of hourly rates charged and that the success was 'exceptional'.
 
 
 [23]
 To date, counsel have dedicated 6,053 hours. Their fee application of December 3, 1982 includes a 120 hour allowance for all future activity arising in this and related proceedings. The fee requested reflects a multiple of approximately 1.6 over Mr. Bebchick's 1982 lodestar rate of $160 per hour
 
 
 [24]
 The 6,000 hours are broken down in the following manner:
 WMATC Docket 32: 571 hours
 WMATC Docket 101: 517 hours
 WMATC Order 245: 533 hours
 WMATC Order 563 and 564: 596 hours
 Commission proceeding on remand from Williams: 616 hours
 Court of Appeals (D.C.) Nos. 23720 + 23747: 446 hours
 Bebchick v. WMATC, 489 F.2d 1272 (D.C.Cir.1974): 139 hours
 Commission Proceedings On Remand from Bebchick II: 1,096 hours
 645 F.2d 1086 (D.C.Cir.1981): 176 hours
 Court of Appeals (D.C. 74-1793 + 74-1831): 489 hours
 Bebchick v. District of Columbia, American Security Bank, D.C. Transit System, Inc. (Superior Court--D.C. No. CA 7274-77): 51 hours
 Court of Appeals, Supplemental Review Proceedings (D.C. No. 21865, et al.): 484 hours
 Commission Proceedings on Remand from Bebchick III : 219 hours.
 
 
 [25]
 The Commission has expressed doubt "as to the value of the benefit resulting from the Bebchick group's efforts with respect to" the adjustment to the amortization schedule of Transit's Acquisition Adjustment Account, and has asked this court to determine attorney fees without considering that asserted benefit bestowed by the Bebchick group. Respondent's brief at 13. Because our consideration primarily focuses on factors other than the proven benefit to the riders from particular efforts of the Bebchick group, we need not decide whether the Commission's doubts are warranted. This court has always intended, and prior opinions demonstrate that belief, that the Bebchick group be awarded fees for all activity before the Commission and the court challenging actions prejudicial to the riders. Pennsylvania v. Delaware Valley Citizens' Council, --- U.S. ----, 106 S.Ct. 3088, 3094-97, 92 L.Ed.2d 439 (1986) (fees for participation in administrative proceedings); City of Riverside v. Rivera, --- U.S. ----, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986) (plurality opinion) (fees for hours reasonably expended on unsuccessful claims where party achieves a certain level of overall success)
 
 
 [26]
 Beverly C. Moore, Jr. submitted an affidavit and statistical study in support of the Bebchick application. Mr. Moore is the Editor of Class Action Reports, a legal periodical. In this affidavit, Mr. Moore notes that the 6,053 hours claimed by counsel compares most favorably with the average time spent in 27 successful class action cases where the recovery ranged between $4 million and $10 million. In these suits, the average case (which did not involve administrative proceedings) lasted 5.1 years and called for an average of 6,988 hours of attorneys' time. Moore Affidavit at 7
 
 
 [27]
 To help reduce the loss to Bebchick resulting from the delay in payment for services rendered on behalf of the riders, we have calculated the lodestar based on Mr. Bebchick's hourly rates as of 1982
 
 
 [28]
 Counsel support their request with material detailing the asserted exceptional nature of the case. See Blum, 465 U.S. at 898, 104 S.Ct. at 1548
 
 
 [29]
 See Blum, 465 U.S. at 901, 104 S.Ct. at 1550 (quoting Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)), where the Court stated that "an enhanced award may be justified in some cases of exceptional success"; see also Pennsylvania v. Delaware Valley Citizens' Council, --- U.S. ----, 106 S.Ct. 3088, 3097-3100, 92 L.Ed.2d 439 (1986); Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 28-29 (D.C.Cir.1984), cert. denied, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985); Murray v. Weinberger, 741 F.2d 1423, 1428 (D.C.Cir.1984)
 
 
 [30]
 See Copeland, 641 F.2d at 906, where this circuit stated that "[t]he 'lodestar' fee may be increased to reflect the possibility that the litigation would not be successful and that no fee ultimately would be obtained." Our decisions since Copeland have consistently held that only in an "exceptional case" should a court make an upward adjustment to compensate attorneys for their risking of losing. See Sierra Club v. Environmental Protection Agency, 769 F.2d 796, 809 (D.C.Cir.1985); Laffey v. Northwest Airlines, 746 F.2d at 26-29; Murray v. Weinberger, 741 F.2d at 1431-32. We follow the rule "that enhancements are to be awarded only in the exceptional cases," Laffey, 746 F.2d at 28, because the Supreme Court has deferred for reargument the issue of the relevance of the contingency of success factor. Pennsylvania v. Delaware Valley Citizens' Council, 106 S.Ct. at 3099
 
 
 [31]
 See Copeland, 641 F.2d at 894, where the court stated "[u]ntil now the calculations have entirely ignored the results of the litigation. Success was a threshold inquiry relevant to the entitlement vel non to a fee, but the amount or nature of recovery was not considered in setting the 'lodestar'. These latter factors should be considered now, under the rubric of 'quality of representation'."
 
 
 [32]
 We note also that the number of hours expended on this case involving numerous administrative and judicial proceedings over a period of 20 years compares most favorably to the average time spent on successful class action cases enjoying a similar monetary recovery. See supra note 26. See also Pennsylvania v. Delaware Valley Citizens' Council, 106 S.Ct. at 3099
 
 
 [33]
 The factors are:
 
 
 [1]
 what, if any, payment each attorney would have received had the suit not been successful;
 
 
 [2]
 what, if any, costs or expenses each attorney would have incurred if the case had been lost;
 
 
 [3]
 whether, after the successful verdict, Nachman and Moreno [counsel] were completely dependent upon the court for their fees;
 
 
 [4]
 the length of time and number of hours the case consumed during which Nachman [lead counsel] was required to compensate his associates and carry his overhead expenses without assurance of compensation; and
 
 
 [5]
 whether other attorneys refused to take the case because of a risk of nonpayment
 Wildman, 771 F.2d at 614.
 
 
 [34]
 This figure contains some additional compensation for the delay in payment from 1982 to December 1984 comparable to that which the court-ordered account earned. Library of Congress v. Shaw, --- U.S. ----, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)--which forbids interest on an award of attorney fees against the Government in the absence of an explicit provision therefor--is inapplicable to the present case which does not involve the Government or the doctrine of sovereign immunity; all the "common fund" at issue was supplied by Transit, a private company
 
 
 [35]
 Actually, we believe that all of the enhancement over the lodestar can be attributed, in the circumstances of this case, to the fact that this is a "common fund" case in which the total requested fee of about 25% of the fund is reasonable. The other factors should be taken into account but need not be given separate valuations